IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 6, 2012

## LEON GOINS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dyer County**
**No. 08-CR-234     Lee Moore, Judge**

_____

**No. W2011-00668-CCA-R3-PC  - Filed April 23, 2012**

_____

The petitioner, Leon Goins, appeals the denial of his petition for post-conviction relief challenging his Dyer County Circuit Court jury conviction of possession with intent to sell or deliver .5 grams or more of cocaine and resulting 25-year sentence.  In this appeal, he asserts that he was denied the effective assistance of counsel.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Danny H. Goodman, Tiptonville, Tennessee, for the appellant, Leon Goins.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; and Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 21, 2008, a Dyer County Circuit Court jury convicted the petitioner of possession with intent to sell or deliver .5 grams or more of cocaine, and on January 20, 2009, the trial court imposed a Range III sentence of 25 years' incarceration. The petitioner filed a timely but unsuccessful appeal in this court, *see State v. Leon Goins*, No. W2009-02096-CCA-R3-CD (Tenn. Crim. App., Jackson, Oct. 4, 2010), and the petitioner did not seek discretionary review by the supreme court, choosing instead to file a petition for post-conviction relief.  The facts, as summarized by this court on direct appeal, are as follows:

Officer Thomas Langford of the Dyersburg Police

Department received information from a confidential informant that he had seen a quantity of drugs in the [petitioner]'s residence at 607 Peabody. Based upon this information, a warrant was obtained, and several officers proceeded to the residence in order to execute it. Upon arriving at the home, officers observed several people in the yard outside the home. Because the element of surprise was lost, officers proceeded to secure the residence through the use of forced entry. Upon entry, Officer Todd Thayer found one female in the living room of the residence, who was later determined to be Pam White, the [petitioner]'s fiance. She was searched, but officers found no money or drug paraphernalia on her person. In the [petitioner]'s bedroom, officers discovered a table inside a walk-in closet. On the table was a rock of crack cocaine, later determined to weigh 7.9 grams. A razor blade, commonly used to cut pieces from a large rock, was found next to the drugs. No other items of drug paraphernalia were discovered. However, there was "a lot of money laying on the dresser" in the bedroom. No attempt was made to obtain fingerprints from the razor blade because of the nature of the surface.

The [petitioner] was found in the backyard of his residence, along with several other people. He was searched for safety reasons, and officers discovered $343 in his pocket and $67 in his wallet. He was arrested by officers on the scene. However, before officers could question the [petitioner] or transport him to the jail, he began having chest pains. An ambulance was called, and he was transported to the local hospital.

Based upon the foregoing, the [petitioner] was indicted by a Dyer County grand jury for one count of possession of cocaine, over .5 grams, with the intent to sell or deliver. The [petitioner] pled not guilty, and a jury trial was held. At trial, each of the officers testified to the above scenario. Additionally, officers testified that a rock as large as the one found in the [petitioner]'s closet was not usually for a single user and that the value of the rock, intact, was approximately $250-$300. However, Officer Thayer further explained that smaller pieces, usually weighing .1 grams, were sold directly to users, but larger

rocks weighing approximately 3.5 grams were sold to those intending to resell to others. He estimated that the value of the cocaine found in the [petitioner]'s closet, if broken down into smaller pieces for resale, would be approximately $1000.

The [petitioner] presented five witnesses in his defense and proceeded under a theory that the cocaine belonged to Stanley Shaw. He first called Stanley Shaw, who admitted that he had given a sworn statement to police that the cocaine found in the [petitioner]'s residence was his. However, he clarified in his testimony that he had lost an $8 rock of cocaine at the [petitioner]'s house earlier and that he believed that is what he was accepting responsibility for in the statement. He went on to testify that the [petitioner] had written out the statement for him. He testified that he did not live with the [petitioner] at his residence and that he had been at work on the day the police came. He further admitted that he was a crack cocaine user but stated that he did not have the financial ability to purchase a rock of crack as large as the one found in the [petitioner]'s home. He went on to state that if he had that much crack, he would have smoked it all at one time and that it would have killed him.

The defense then called Jane Cherry, Stanley Shaw's employer. She testified that Shaw was not at work that day because the bowling alley was closed. According to Cherry, Shaw earned approximately $70 per month for buffing the floors.

Finally, the defense called James Barr, Winston Sharp, and Pam White. Barr testified that he lived behind the [petitioner]'s residence and that he was outside on the day the police came. He stated that the police arrived before the [petitioner], whom he saw walking up the street. He further testified that Stanley Shaw had been staying with the [petitioner], but he did not see him on this particular day. He also testified that he and the [petitioner] sold scrap metal together and that the [petitioner] did this to supplement his social security disability. Finally, he acknowledged his own use of crack cocaine and admitted that a rock as big as the one found

-3-

at the [petitioner]'s residence would not normally be for personal use.

Winston Sharp, the [petitioner]'s cousin, also testified that Shaw was living with the [petitioner] at the time. He stated that he visited the [petitioner]'s home that day, January 9, and that Shaw had asked him if he wanted to buy some crack. However, after testifying that this occurred in the summer, he acknowledged that he might have been confused about the days. Finally, Pam White, the [petitioner]'s fiance, testified that she was at the residence on that day and that a party was going on. She testified that the [petitioner] was not there but that Shaw kept coming "in and out."

*Leon Goins*, slip op. at 1-3.

In his petition, the petitioner alleged, among other things, that he was denied the effective assistance of counsel. Via an amended petition filed by post-conviction counsel, the petitioner claimed that his trial counsel performed deficiently by failing to advise him of the elements of the charged offense, by failing to advise him of a plea offer from the State, by failing to advise him regarding the applicable sentencing range, by failing to meet with him before trial or sentencing, by failing to provide him with discovery, and by failing to subpoena witnesses to testify on his behalf.

At the evidentiary hearing, the petitioner testified that his trial counsel, an assistant district public defender, failed to inform him of the elements of the charged offense prior to his arriving in court on the day of trial. Although the petitioner insisted that counsel also failed to discuss the applicable sentencing range with him prior to trial, he said, "I thought I was going to get 45 percent for this charge." The petitioner said that trial counsel never discussed the State's plea offer with him and that he would have considered the offer had he been made aware of it prior to trial. He said, "I probably would have took [sic] the plea bargain. But since I didn't have a plea bargain, I didn't have any choice but to go to trial. He said it wasn't one."

The petitioner said that he met with trial counsel only twice prior to trial and that on both occasions their conversation centered on a statement provided by Stanley Shaw. As a result of counsel's failure to meet with him, the petitioner said that he was unprepared to go to trial. He testified that counsel did not provide him with discovery materials and that he failed to subpoena potential witnesses. Specifically, the petitioner claimed that he asked trial counsel to subpoena Mike Taylor and "some of the people that was out there that the

police didn't have the name of." He admitted, however, that he had not provided trial counsel with the names of those individuals. The petitioner said that these potential witnesses "would have made a lot of difference because they knew I wasn't there and they knew Stanley Shaw was actually the one selling dope."

The petitioner said that he did not speak to trial counsel between his conviction and sentencing and that trial counsel refused the trial court's order that he "come down there and do the sentencing report" with the petitioner. The petitioner said that he wanted to call his nieces, his aunt, and his Uncle Richard as witnesses at the sentencing hearing.

During cross-examination, the petitioner acknowledged that he was aware of his prior criminal record and that he had participated in three previous jury trials, including one for a charge of selling .5 grams or more of cocaine. He nevertheless maintained that he was unclear on the elements of possession with intent to sell or deliver .5 grams or more of cocaine, saying, "Laws change." The petitioner said that his defense was always that the drugs found during the execution of the search warrant at his residence did not belong to him and instead belonged to Stanley Shaw. The petitioner maintained that despite his innocence, he might have accepted a plea offer. The petitioner acknowledged that he had not previously accepted any plea agreement offered by the State and had gone to trial on several prior occasions. The petitioner acknowledged that trial counsel presented witnesses on his behalf, including some whose names were provided to counsel by the petitioner.

Trial counsel testified that he was appointed to represent the petitioner on June 30, 2008, and that the petitioner told him, "I'm not interested in a plea. I'm going to trial." At that time, the petitioner gave trial counsel a statement purportedly signed by Mr. Shaw admitting his culpability in the offense. He said that the petitioner insisted that the matter be set for trial. In preparation for trial, trial counsel discussed trial strategy with the petitioner as well as the potential range of punishment should he be convicted. Counsel said that he specifically recalled discussing range of punishment with the petitioner because they did it at the same time they discussed those prior convictions that might be used to impeach the petitioner at trial.

Counsel said that he subpoenaed each of the witnesses named to him by the petitioner but that the defense did not present the testimony of all those witnesses at trial. He said that he made the decision not to call many of the witnesses because the testimony of those he did call was "so wildly different than what they told [counsel] in the street" that he "made a decision at that point to limit . . . damage." Counsel testified that he chose not to call the person who notarized Mr. Shaw's signature on the inculpatory statement because, when interviewed, she intimated that Mr. Shaw was being intimidated by the petitioner, who had written the note and accompanied Mr. Shaw to have it notarized.

Counsel said that his "hands were tied by" the petitioner, who "decided the trial strategy and as much as he could he decided trial factors." Counsel said that his desired trial strategy was "to pin it on Ms. White" rather than Mr. Shaw, but the petitioner refused to allow that strategy because Ms. White "had some sort of romantic relationship" with the petitioner. He testified that he knew that Mr. Shaw would provide testimony that was contrary to the notarized statement because he had interviewed Mr. Shaw prior to trial. Counsel reiterated that the greatest difficulty at trial "was that the witnesses that [the petitioner] provided gave . . . certain statements out on the street and when . . . they were under oath on the witness stand the story started changing so drastically." Counsel said that he found himself "in a hole" and that his only option at that point "was to quit digging."

Counsel testified that he and the petitioner did not have a working relationship between the trial and sentencing because the petitioner, five days after the verdict, had filed a complaint with the Board of Professional Responsibility that was filled with erroneous accusations. Counsel said that the visitor's log from the jail indicated that he had visited the petitioner at the jail three times and that did not count the times that he met with the petitioner on court days.

During cross-examination, trial counsel testified that "[e]xactly the first thing" that the petitioner said to him when they met following his arraignment was that he would not consider accepting a plea agreement. Counsel said that he did not think he ever showed the petitioner a plea offer given the petitioner's statement. He said that if he thought "there was any possibility of a plea [he] would have pursued it" because a plea took much less of his time and effort than preparing for a felony trial. Counsel could not recall whether he gave the petitioner a copy of the discovery materials. Counsel acknowledged that his last meeting with the petitioner was "a week to ten days" prior to trial but explained that he did not need to meet with the petitioner during that time.

Counsel said that he refused to meet with the petitioner between trial and sentencing because of "[t]he blatant lies [the petitioner] told about [counsel] in . . . his letters to the Board of Professional Responsibility." He acknowledged his obligation to represent the petitioner at the sentencing hearing but testified that he was unwilling to meet with the petitioner "one-on-one" because "there is no telling what he's going to say" to the Board regarding the counsel's advice. Counsel said, "I showed up at the sentencing hearing. It was what it was. We argued what we did. . . . But . . . to be honest with you, I didn't think that getting his Sunday School teacher in here and saying that he was a nice guy was really going to make a whole lot of difference at the sentencing hearing." Counsel stated that he had asked the court for permission to withdraw from the case, but the trial court denied his request.

During redirect examination, counsel testified that the petitioner procured the statement from Mr. Shaw less than a week after the search warrant was executed at his residence and prior to his even being charged in the case. He said that he was concerned about the petitioner's refusal to accept responsibility for the offense and what effect that might have on his sentencing.

At the conclusion of the hearing, the post-conviction court denied relief, accrediting trial counsel's testimony that he met with the petitioner several times and that the petitioner was vehemently opposed to considering a plea offer. The court offered its own independent recollection that the petitioner was eager to go to trial. The court also concluded that counsel had subpoenaed those witnesses desired by the petitioner. The court determined that any deficiency in the failure to provide the petitioner with a copy of the discovery materials did not inure to the petitioner's prejudice. The post-conviction court ruled that trial counsel should have met with the petitioner prior to sentencing but that the petitioner had failed to establish any prejudice stemming from this deficiency.

In this appeal, the petitioner reiterates his claims that trial counsel performed deficiently by failing to meet with him a sufficient number of times prior to trial, by failing to discuss a plea offer with him, by failing to discuss the elements of the charged offense with him, and by failing to advise him of his sentencing range. We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court affords deference to the post-conviction court's findings of fact, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The accredited testimony of trial counsel established that counsel met with the petitioner three times at the jail and several times in court. That being said, the petitioner has failed to allege what, if anything, would have been gained by simply meeting with counsel more times or how he was prejudiced by the number of meetings between the two. Counsel's accredited testimony established that he discussed with the petitioner the potential range of punishment, and the petitioner's own testimony established that he was aware of his range prior to sentencing because he believed he "was going to get 45 percent for this charge." Counsel should have related the State's plea offer to the petitioner, but counsel's testimony and the post-conviction court's own recollections of the petitioner's case established that the petitioner was adamant about going to trial. Moreover, although the petitioner testified that he "probably would have took" the State's offer, the petitioner acknowledged that he had insisted on going to trial in all of his previous cases. Finally, although trial counsel did not meet with the petitioner prior to the sentencing hearing, the petitioner failed to establish any prejudice flowing from this failure. The petitioner claimed that he wanted to present the testimony of certain witnesses at the sentencing hearing, but he failed to present those witnesses at the evidentiary hearing. "When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). If he fails to do so, he generally fails to establish ineffective assistance of counsel. *Id.* The post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Id.*; *see also Wade v. State*, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995).

Because the petitioner has failed to establish any prejudice as a result of the deficiencies in counsel's performance, the judgment of the post-conviction court denying relief is affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE